Fuchsberg, J.
The issue is whether certain repairs and alterations made by a tenant to his rent-controlled apartment constitute grounds for eviction under the provisions of subdivision a of section 52 of the New York City Rent, Eviction and Rehabilitation Regulations.
The Civil Court of the City of New York granted the landlord’s petition for eviction; the Appellate Term and the Appellate Division, successively, each affirmed. The tenant appeals to this court by leave of the Appellate Division. For the reasons which follow, we believe there should be a reversal.
Subdivision a of section 52 of the Rent, Eviction and Rehabilitation Regulations, in pertinent part, reads:
"[A]n action or proceeding to recover possession of any housing accommodation shall be maintainable * * * upon one or more of the following grounds:
"a. The tenant is violating a substantial obligation of his tenancy other than the obligation to surrender possession of such housing accommodation and has failed to cure such violation after written notice by the landlord that the violation cease within 10 days; or within the 3 month period immediately prior to the commencement of the proceeding, the tenant has wilfully violated such an obligation indicting *177 serious and substantial injury upon the landlord”. (Emphasis added.)
Turning to the facts, the record on this appeal discloses that the tenant has lived in his one-room studio apartment for approximately 10 years. In May of 1973, the building was purchased from its former owner by the landlord, who immediately requested the existing rent-controlled tenants to vacate the building so that he could renovate the premises, offering at least some of them a sum of money as inducement to do so.[1] The tenant before us received such an offer but declined to move. He also called the landlord’s attention to the fact that his ceiling was falling in and asked that it be repaired. The landlord did not do so.
The tenant thereupon replaced it with one constructed of three-eighths inch sheetrock and, in the course of doing so, had a licensed electrician install a working ceiling light fixture controlled from a wall switch in place of the preexisting malfunctioning, old-fashioned, pull-chain one. He also attached a single wooden closet to a wall and erected a small decorative wooden frame around the room’s only window. That is the sum total of the "repairs and alterations” involved here.
In essence, in its petition brought pursuant to subdivision a of section 52, the landlord alleged that the repairs to the ceiling did not conform to section 60 of New York City’s Fire Code, which specifies five-eighths inch rather than three-eighths inch sheetrock be used, and that the lighting fixture, the closet and the window frame were so permanent or lasting in nature and so materially altered the premises that they violated the "substantial obligation” of the tenancy contemplated by the section. In support of its position, it cites Freehold Investments v Richstone (69 Misc 2d 1010, revd 72 Misc 2d 624, revd 42 AD2d 696, revd 34 NY2d 612).
It is to be noted, however, that, unlike the present case, Freehold involved the terms of a lease. That was not the only *178 difference between the two cases. The alterations there included "extensive * * * wall reconstructions” and other changes costing $5,500. And, though no prior defective conditions, such as the defective ceiling here, had existed there, the work was expressly found to have resulted in "substantial injury to the freehold” (72 Misc 2d 624, 625-626, supra).
Further, the Freehold lease’s language prohibited (p 625) "any alterations” without the landlord’s express permission. The violation of an express covenant not to make alterations is a substantial violation (see Deutsch v Hoe Estate Co., 174 App Div 685; Holden v O’Brien, 209 App Div 266, affd 240 NY 560; Cohen v Bass, Inc., 246 NY 270; First Nat. Stores v Yellowstone Shopping Center, 21 NY2d 630; Sigsbee Holding Corp. v Canavan, 39 Misc 2d 465, affd by App Term, 1st dept., Oct., 1963, No. 171; see, also, Bentley, An Alternative Residential Lease, 74 Col L Rev 836, 840).
The present case proceeds on a different legal footing. Whether there was here a violation of the tenant’s obligations to the landlord is to be determined within the regulatory framework of subdivision a of section 52. It sets out two alternative conditions under which a landlord may seek eviction. While both require the violation of a substantial obligation of the tenancy, the first requires that the landlord have given notice. If, within 10 days, the violation is cured by the tenant, there may be no eviction. The second alternative permits the landlord to omit notice and proceed directly to eviction if the violation, in addition to being substantial, is willful and injurious to the landlord. Since the parties conceded that no notice to cure was ever given, the landlord must bring himself within the conditions imposed by the second part of subdivision a of section 52, which are the portions emphasized above.
It must be remembered that subdivision a of section 52 is part of a legislative design regulating relationships between landlords and tenants in rent-controlled apartments. That design imposes certain conditions on both parties, on the one hand limiting the return which landlords may receive on their investments, and, on the other, making it unlikely that tenants will receive any but such services as the regulation dictates rather than those which might be obtainable in an open rental market (see H.I.M. Props. Corp. v Gross, 6 Misc 2d 666, 668; Suppus v Bradley, 278 App Div 337, 338-339; cf. Matter of 89 Christopher v Joy, 35 NY2d 213, 217). In such *179 circumstances, it would be unrealistic not to expect tenants themselves to provide desirable amenities which rent-controlled landlords will not furnish. Indeed, subdivision a of section 52 is not hostile to their doing so, provided they refrain from the commission of waste as the common law defines that term.
The question then is whether the repairs and alterations before us constituted waste.
Basically, at common law waste had three different definitions, each related to particular types of conduct on the part of tenants. Involuntary waste was defined as failure to prevent damage to the premises, in other words negligence.[2] Equitable waste was defined as failure to do what a prudent owner would do and was available as a cause of action only in limited circumstances. Neither of these concepts is relevant to the facts at hand. But the third, voluntary waste, is. It occurs when a tenant injures the premises by an affirmative act (see 5 Powell, Real Property, par 640; 63 NY Jur, Waste, § 2, p 109, and cases cited therein).
Voluntary waste as a concept stems from early English common law concern that the interests in land held by reversioners or remaindermen be protected from depredations by life tenants of scarce natural resources (5 Powell, Real Property, par 637). For instance, the cutting of trees or exhaustion of coal supplies were regarded as waste because their effects extended well beyond the term of the tenant’s temporary interest in the land or premises. It is the impingement upon the ultimate estate of the landlord which is the keynote to the definition of waste (Rasch, New York Landlord and Tenant [2d ed], § 455).
Its application in a modern landlord-tenant setting is well described in Pross v Excelsior Cleaning & Dyeing Co. (110 Misc 195, 201): "[S]uch a change as to affect a vital and substantial portion of the premises; as would change its characteristic appearance; the fundamental purpose of the erection; or the uses contemplated, or a change of such a nature, as would affect the very realty itself, extraordinary in scope and effect, or unusual in expenditure”.
Other courts have also emphasized the definition of waste as *180 permanent or lasting damage (Wall Nut Prods. v Radar Cent. Corp., 20 AD2d 125, 126-127, and cases cited therein; Agate v Lowenbein, 57 NY 604; 63 NY Jur, Waste, § 1, p 108, and cases cited therein).
Thus, not every change or alteration made by a tenant constitutes waste. For instance, prior to modern leasing developments, except as provided in tenement house legislation (see Multiple Dwelling Law, § 78), it was, and is, the tenant’s and not the landlord’s obligation to make repairs (Altz v Leiberson, 233 NY 16; Emigrant Ind. Sav. Bank v 108 West Forty-Ninth St. Corp., 280 NY 791; cf. Tonetti v Penati, 48 AD2d 25).
Short of waste, a tenant may also make nonstructural alterations consistent with the use of the premises contemplated by his possession of them (Diener v Burghart, 186 NYS 565; Klein’s Rapid Shoe Repair Co. v Sheppardel Realty Co., 136 Misc 332, affd sub nom. Klein’s Rapid Shoe Repair Co. v 120-122 East 14th St. Corp., 228 App Div 688; Leong Won v Snyder, 94 NYS2d 247; Rubinger v Del Monte, 217 NYS2d 792; Andrews v Day Button Co., 132 NY 348; Sigsbee Holding Corp. v Canavan, supra).
The ready removability of installations is a significant factor. For "[i]t does not follow that a tenant, by virtue of his obligation to commit no waste, may make no alterations whatsoever. Except as the tenant’s rights may be limited by the terms of the lease, the tenant is at liberty to erect structures, or to make non-structural alterations, for the purpose of carrying on legitimate business on the demised premises, and to remove them within the term, provided such structures or alterations will not do any serious injury to the realty” (Rasch, New York Landlord and Tenant [2d ed], § 455, p 577, citing Andrews v Day Button Co., supra; Agate v Lowenbein, 57 NY 604, supra).
In this perspective, it becomes apparent that in the case before us there was insufficiént proof of any repair or alteration which could be characterized as one causing permanent or lasting injury to the premises. The apartment in issue remains a one-room studio. Its four walls are intact and remain in place. The closet and windowframe built by the tenant are merely nailed to and not built into the walls; there was no showing that either cannot be taken down and removed at minimal, if any, expense or damage. They are clearly consistent with the tenant’s use of the apartment as a *181 residence. The ceiling light fixture is a straight replacement of the old and unworkable one by a new and functioning equivalent; the addition of a modern wall switch could hardly have been more de minimis. The replacement for the defective ceiling itself, though, according to the parties’ stipulation, not as thick as that required by the fire code, was of the required composition and, interestingly, no violation because of it had ever been issued by the city. More pointedly, the landlord made no showing whatsoever, whether by stipulation or otherwise, that the thickness of the falling ceiling which it replaced was any greater than the one of which it complained in this proceeding.
Significant too, especially on the question of the regulation’s requirement that there be a showing of willfulness, is the fact that the tenant, though compelled to remedy the ceiling problem on his own and unaware that his choice of materials could be cause for complaint, upon learning that it was, offered to correct it. His offer, never withdrawn, was refused, the landlord insisting on nothing less than eviction.
We conclude, therefore, that, as a matter of law, the landlord did not establish that the tenant inflicted serious and substantial injury upon the landlord by willfully violating a substantial obligation of his tenancy. Accordingly, the order of the Appellate Division should be reversed and the petition dismissed.

. Prior to 1971, rent-controlled apartments remained so even when an existing tenant moved out and a new tenant moved in (L 1946, ch 274, § 2). In 1971, as a result of the enactment of the vacancy decontrol provision (New York City Rent, Eviction and Rehabilitation Regulations, § 2, subd f, par [17]), landlords could renovate and rerent previously controlled apartments on an uncontrolled basis at higher rents once existing rent-controlled tenants vacated (see Matter of Hartman v Joy, 47 AD2d 624). On May 29, 1974 vacancy decontrol became subject to the Emergency Tenant Protection Act (L 1974, ch 576, §§ 1, 2).

. The use of the word "wilfully” in the second portion of subdivision a of section 52 indicates its inapplicability to situations involving mere negligence (see § 52, subd b; 5 Powell, Real Property, par 640).